[Cite as *Adams v. Kline & Kavali Mechanical Contrs., L.L.C.*, 2026-Ohio-816.]

| | | | |
|---|---|---|---|
| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

HEATHER MARIE ADAMS

    Appellant

    v.

KLINE & KAVALI MECHANICAL
CONTRACTORS, LLC, et al.

    Appellees

C.A. No.     31429

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CV-2022-09-3056

DECISION AND JOURNAL ENTRY

Dated: March 11, 2026

STEVENSON, Presiding Judge.

{¶1}    Appellant Heather Marie Adams, individually and as fiduciary of the estate of Ryan Adams, deceased ("Ms. Adams") appeals from the judgment of the Summit County Court of Common Pleas granting the motions for summary judgment of Appellees Building Technicians Corporation ("BTC"), Ivy E. Walters and Ronald C. Gilbert (collectively "Safety Pro"), Technical Assurance, Inc. ("Technical"), and FirstEnergy Corp., FirstEnergy Services Company, and American Transmission Services, Inc. (collectively "FirstEnergy"). This Court affirms.

I.

**Background**

{¶2}    Ryan Adams was working as a foreman roofer for BTC on December 23, 2020, when he tragically fell over 20 feet through a roof. Mr. Adams sustained serious injuries in the fall and he died from those injuries on October 29, 2023.

{¶3} BTC was the contractor completing a roof replacement project at Fairlawn Service Center Building No. 5 ("Building No. 5") when Mr. Adams fell. Mr. Adams was employed by BTC and he was the BTC foreman for the roof replacement project. Building No. 5 has five roofs and Mr. Adams was working on Roof 2 when he fell. FirstEnergy owned Building No. 5.

{¶4} The K Company, Inc. was performing an interior renovation at Building No. 5 at the same time as the roof replacement project. [1] The K Company removed an HVAC unit referred to as RTU5 from Roof 2 two days before Mr. Adams' accident. RTU5 sat on a metal curb when it was on the roof and the metal curb remained after the HVAC unit was removed. The K Company placed a metal cap, shaped like a shoebox lid, on the curb which made the roof weather/watertight.

{¶5} Mr. Adams and Keith Getz removed the metal curb at the RTU5 location on December 23, 2020. Keith Getz is also a BTC foreman but he had completed his project at another location and was working as a laborer at Building No. 5 on the day of the accident. Mr. Getz observed two holes, between 12 and 15 inches by 12 and 15 inches each and four inches apart, in the tectum decking when the curb was removed. He testified that the holes were not big enough for a human to fit through. Mr. Getz believed the holes would be used with a future HVAC system and that is why BTC was not replacing the tectum which appeared to be structurally sound. Mr. Adams used the metal cap as a temporary cover over the holes while the roofers went to lunch.

{¶6} Mr. Adams returned to the RTU5 location after lunch. Mr. Getz testified that Mr. Adams was going to grind flange off the sides of the metal cap so the metal could be used as a temporary cover until the new curb and HVAC unit were delivered and installed.

---

[1] Ms. Adams dismissed her claims against the K Company and the K Company is no longer a party to this action.

{¶7} Mr. Adams fell through the roof while working at the RTU5 location. He was not wearing safety harness protection when he fell. There were no witnesses to the fall.

{¶8} FirstEnergy had contracted with Technical to manage and serve as consultant/advisor for the roof replacement project at Building No. 5. FirstEnergy relied on Technical "to decide and help [them] in the selection and the technical analysis of the bids" submitted for work on the roofs. FirstEnergy relied on Technical's consulting advice when it contracted with BTC to perform the roof replacement project.

{¶9} BTC contracted with Safety Pro to provide annual, once a year, safety awareness training to its employees; to conduct six job site inspections a year; and to perform website administration. Safety Pro's annual safety training included an hour of drug and alcohol training and a "refresher or reminder" on "[c]onstruction-type stuff; ladders, HazCom, lockout/tagout, [and] fall protection[.]" Safety Pro contracts with various contractors in the construction industry and its training was not targeted or limited to roofing contractors. BTC would contact Safety Pro when it wanted a job site inspection. The parties agree that BTC never contacted or asked Safety Pro to inspect the Building No. 5 job site.

{¶10} Ms. Adams, individually and as Fiduciary of the Estate of Ryan Adams, filed suit against FirstEnergy, BTC, Technical, Safety Pro, and other defendants who were later dismissed from the lawsuit. She alleges in her second amended complaint that the defendants engaged in "careless, negligen[t], reckless, and/or intentional conduct" causing Mr. Adams to fall through "a concealed hole" in the roof. It is alleged that Mr. Adams' injuries and death were a direct and proximate result of the defendants' conduct. Ms. Adams asserts claims for loss of consortium and wrongful death pursuant to R.C. 2125.01 *et seq.* Answers and counterclaims were filed.

{¶11} BTC, Technical, FirstEnergy, and Safety Pro moved the trial court for summary judgment on Ms. Adams' complaint and cross-claims that had been filed. The trial court granted the motions for summary judgment on Ms. Adams' complaint and dismissed as moot the motions for summary judgment on the cross-claims. Ms. Adams appeals, asserting four assignments of error for this Court's review.

II.

## ASSIGNMENT OF ERROR NO. 1

### THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANT-APPELLEE BUILDING TECHNICIANS CORP.

{¶12} Ms. Adams asserts in her first assignment of error that the trial court erred in granting summary judgment to BTC. We disagree.

### Standard of Review on Summary Judgment

{¶13} This Court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). Summary judgment is appropriate under Civ.R. 56 when: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977), citing Civ.R. 56(C). A court must view the facts in the light most favorable to the nonmoving party and must resolve any doubt in favor of the nonmoving party. *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 358-359 (1992). "A trial court does not have the liberty to choose among reasonable inferences in the context of summary judgment, and all competing inferences and questions of credibility must be resolved in the nonmoving party's favor." *Jones v. Soto*, 2023-Ohio-3107, ¶ 26 (9th Dist.).

{¶14} The Supreme Court of Ohio has set forth the nature of the burden-shifting paradigm of a motion for summary judgment as follows:

> [A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.

*Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996).

### Ms. Adams' claims against BTC

{¶15} Ms. Adams alleges that BTC knew Mr. Adams was working on a dangerous roof and that it knew with substantial certainty he would sustain an injury. She contends that, despite this knowledge, BTC "require[d] [Mr.] Adams to perform the dangerous task of working on a roof where a concealed and dangerous hole in the roof had been created and maintained thereby creating a hole to fall 20 feet through to the ground below[.]" Ms. Adams claims BTC committed a tortious act with intent to injure pursuant to R.C. 2745.01.

{¶16} "'Under Ohio law, employees injured in the workplace are generally limited to the remedy provided by the Workers' Compensation Act.'" *Simonelli v. Fligner*, 2012-Ohio-6112, ¶ 8, quoting *Barton v. G.E. Baker Constr., Inc.*, 2011-Ohio-5704, ¶ 7, citing R.C. 4123.74. *Miller v. Akron Gen. Med. Ctr.*, 2015-Ohio-2626, ¶ 9 (9th Dist.). "'However, in limited situations, an injured

employee may bring a claim against his employer for an employer intentional tort pursuant to the provisions of R.C. 2745.01.'" *Miller* at ¶ 9, quoting *Simonelli* at ¶ 8.

{¶17} R.C. 2745.01 provides in pertinent part:

(A) In an action brought against an employer by an employee, or by the dependent survivors of a deceased employee, for damages resulting from an intentional tort committed by the employer during the course of employment, the employer shall not be liable unless the plaintiff proves that the employer committed the tortious act with the intent to injure another or with the belief that the injury was substantially certain to occur.

(B) As used in this section, "substantially certain" means that an employer acts with deliberate intent to cause an employee to suffer an injury, a disease, a condition, or death.

(C) Deliberate removal by an employer of an equipment safety guard . . . creates a rebuttable presumption that the removal . . . was committed with intent to injure another if an injury . . . occurs as a direct result.

R.C. 2745.01(A) requires direct evidence of a deliberate intent to injure for there to be a finding of liability; R.C. 2745.01(C) provides that an employers' intent may be established without direct evidence when the employee is injured as a direct result of the employer's deliberate removal of an equipment safety guard. *Hoyle v. DTJ Ents., Inc.*, 2015-Ohio-843, ¶ 10, 12. "R.C. 2745.01(C) creates a rebuttable presumption that the employer intended to injure. It 'is not a separate tort, it merely provides a legally cognizable example of 'intent to injure.'" *Id.* at ¶ 12, quoting *Irondale Indus. Contractors, Inc. v. Virginia Sur. Co., Inc.*, 754 F.Supp.2d 927, 933 (N.D.Ohio 2010).

{¶18} The Ohio Supreme Court has explained that "the General Assembly's intent in enacting R.C. 2745.01, as expressed particularly in 2745.01(B), is to permit recovery for employer intentional torts only when an employer acts with specific intent to cause an injury . . . ." *Kaminski v. Metal & Wire Prods. Co.*, 2010-Ohio-1027, ¶ 56; *Houdek v. ThyssenKrupp Materials N.A., Inc.*, 2012-Ohio-5685, ¶ 24. "By redefining the definition of 'substantially certain' to require deliberate

intent, Section 2745.01 brought Ohio in line with the majority of other states." *Miller* at ¶ 10, citing *Kaminski* at ¶ 99-100 ("R.C. 2745.01 appears to harmonize the law of this state with the law that governs a clear majority of jurisdictions . . . [as] 'Ohio [wa]s one of only eight states that ha[d] judicially adopted a 'substantial certainty' standard for employer intentional torts.'"), quoting (Footnote omitted.) *Talik v. Fed. Marine Terminals, Inc.*, 2008-Ohio-937, ¶ 32, citing 6 Larson, *Workers' Compensation Law*, Section 103.04[1], 103-10 (2007).

{¶19} It is undisputed that Mr. Adams was employed by BTC at the time of the accident and that the accident occurred in the course and scope of that employment. Further, there is no dispute that BTC was a complying employer under Ohio Workers' Compensation system. The parties agree that BTC is not liable unless it acted with a deliberate intent to injure or it deliberately removed an equipment safety guard. R.C. 2745.01(A)/(C). Accordingly, the question before us is whether there is a genuine issue of material fact regarding BTC's deliberate intent to injure or removal of an equipment safeguard.

{¶20} Ms. Adams argues on appeal that BTC deliberately removed the roofing membrane, curb, and metal cap, which are all equipment safety guards, and that there is a rebuttable presumption of intent to harm under R.C. 2745.01(C). She further argues that the trial court incorrectly found "there was no evidence anyone at BTC ordered [Mr. Adams] to work without a safety harness." Ms. Adams contends BTC knew that the tectum at the RTU5 location was structurally deficient and that it ordered Mr. Adams to work without a safety harness despite this knowledge.

{¶21} BTC maintains the roofing membrane, metal cap, and curb are not equipment safety guards. It argues there is no evidence the tectum played a role in Mr. Adams' accident and that it

never ordered Mr. Adams to work without safety harness protection. BTC contends the trial court properly granted summary judgment in its favor.

## Equipment Safety Guard

{¶22} R.C. 2745.01 does not define "equipment safety guard." The Ohio Supreme Court has defined "equipment safety guard" as "a device designed to shield the operator from exposure to injury by a dangerous aspect of the equipment[.]" *Hewitt v. L.E. Myers Co.*, 2012-Ohio-5317, ¶ 2. "[T]he 'deliberate removal' of an equipment safety guard occurs when an employer makes a deliberate decision to lift, push aside, take off, or otherwise eliminate that guard." *Id.*; *Wright v. Mar-Bal Inc.*, 2013-Ohio-5647, ¶ 31 (11th Dist.).

{¶23} "[N]ot all workplace safety devices are 'equipment safety guards' as that term is used in [R.C.] 2745.01." *Barton*, 2011-Ohio-5704, at ¶ 11 (9th Dist.). The trial court granted the employer's motion for summary judgment in *Barton* and this Court affirmed that judgment, concluding that the "failure to use a trench box to protect [] workers from the danger of trench collapse [did] not create a rebuttable presumption of intent to injure under the employer intentional tort statute." *Id.* We concluded that the "trench box" was not an equipment safety guard as "[a] trench is not a piece of equipment and the trench box is not designed to protect the operator of any piece of equipment." *Id.*

{¶24} The Ohio Supreme Court addressed the "deliberate removal" element of R.C. 2745.01(C) in *Hewitt,* 2012-Ohio-5317. The plaintiff in *Hewitt* was in a bucket truck replacing electric power lines when his hand touched an energized line, causing an electric shock and severe burns. *Id.* at ¶ 7. Although the employer provided the plaintiff with protective rubber gloves and sleeves to wear when replacing power lines, he was not wearing protection on the day of the

accident. *Id.* at ¶ 6. The plaintiff claimed a lineman had told him the power line was de-energized and that he did not need protection. *Id.*

{¶25} The *Hewitt* plaintiff argued that "the decision by [his] supervisor to place [him] alone in an elevated bucket close to energized wires without requiring him to wear protective rubber gloves or sleeves amounted to the deliberate removal of an equipment safety guard." *Id.* at ¶ 12. The Ohio Supreme Court disagreed and held:

> the "deliberate removal" referred to in R.C. 2745.01(C) may be described as a careful and thorough decision to get rid of or eliminate an equipment safety guard. Hewitt argues that "removal" is a broad term that encompasses more than just a physical removal. Although "removal" may encompass more than physically removing [a] guard from equipment and making it unavailable, such as bypassing or disabling the guard, an employer's failure to train or instruct an employee on a safety procedure does not constitute the deliberate removal of an equipment safety guard.
>
> Consequently, we hold that the "deliberate removal" of an equipment safety guard occurs when an employer makes a deliberate decision to lift, push aside, take off, or otherwise eliminate that guard from the machine. Here, the employer's failure to instruct Hewitt to wear protective items such as rubber gloves and sleeves and requiring Hewitt to work alone in an elevated bucket do not amount to the deliberate removal of an equipment safety guard within the meaning of R.C. 2745.01(C) so as to create a rebuttal presumption of intent.

(Citations omitted.) *Id.* at ¶ 29-30.

### Roofing Membrane, Curb, Metal Cap

{¶26} Ms. Adams points to no evidence in the record to establish the roofing membrane was a piece of equipment or that it was designed to protect the roofers from a piece of equipment. *Hewitt*, at ¶ 2; *Barton*, 2011-Ohio-5704, at ¶ 11 (9th Dist.). BTC contracted with FirstEnergy to complete a roof replacement project. The project included removing the old roof, replacing tectum decking when determined to be necessary, and installing a new roof over the tectum decking. The evidence in the record supports the trial court's conclusion that BTC roofers had to remove the

roofing membrane and certain tectum to complete the job and for BTC to fulfill its contractual obligations.

{¶27} Next, BTC project manager Matthew Peet explained that the purpose of the curb was to hold the HVAC unit. RTU5 had sat on the curb and the curb remained after this unit was removed. BTC did not remove RTU5 and Mr. Getz testified that the roofers believed a new HVAC unit was going to be installed but had not yet arrived. Because a new HVAC unit would require a new curb, and because the curb may have been causing a leak in the area, BTC had to remove the curb to complete its job. Again, there is no evidence in the record that the curb was equipment or that it was designed to protect Mr. Adams "from exposure to injury by a dangerous aspect of the equipment[.]" *Hewitt*, at ¶ 2; s*ee also Barton*, at ¶ 11 ; *King v. Buildtech Ltd. Constr. Dev.*, 2023-Ohio-1092, ¶ 43 (6th Dist.) (noting that guard rails may be safety devices but do not constitute "equipment safety guard[s]").

{¶28} Lastly, Mr. Getz testified that the purpose of the metal cap was to make the roof weather/watertight after RTU5 was removed. The metal cap was used while the curb was in place. There is no evidence in the record that the metal cap was designed to protect against a fall or injury when it was on the curb. Mr. Adams removed the curb on the day of the accident in compliance with BTC's contract with FirstEnergy and this required him to also remove the metal cap. Further, there is no evidence that the metal cap was designed to protect and shield workers from injury. We additionally note that there is no evidence anyone at BTC had instructed Mr. Adams to modify the metal cap and to use the metal as a covering for the holes in the tectum. Mr. Peet thought that Mr. Adams was going to use plywood to cover the holes, not the metal cap.

{¶29} There is no evidence in the record that the roofing membrane, curb, or metal cap were designed to protect Mr. Adams or the other BTC workers from any piece of equipment.

Accordingly, this Court cannot say that the trial court erred in concluding these items were not equipment safety guards.

### Safety Harness

{¶30} Ms. Adams also contends on appeal that the trial court erred in finding no evidence that BTC ordered Mr. Adams to work without a safety harness. She suggests that BTC's barrier and flagging system on Roof 2, and the requirement that roofers wear safety harnesses when working around a large hole that a body can fit through, constitutes ordering Mr. Adams to work without a safety harness. BTC contends Mr. Adams had received fall protection training, that safety harnesses were always available, and that, unfortunately, Mr. Adams made the tragic decision to work without a safety harness on the day of the accident.

{¶31} The evidence in the record supports the conclusion that Mr. Adams, as foreman, was involved in developing the "game plan" for job safety at Building No. 5. Mr. Peet and Mr. Adams engaged in a pre-construction meeting before starting the roof replacement project and they devised the job safety plan at this site. Because Roof 2 is a flat roof, their safety plan included a cable system that was installed around the perimeter of the roof with full body harnesses that were to be worn when working roof openings.

{¶32} Mr. Peet was not always at the project site. The evidence in the record supports the conclusion that it was Mr. Adams' job, as foreman, to make sure safety procedures were followed. Mr. Adams received fall protection safety training every year at BTC and he completed at least 30 hours of OSHA training during his employment. Like the employer in *Hewitt*, 2012-Ohio-5317, there is no dispute that BTC provided Mr. Adams with fall harness protection when working. There is no evidence in the record that anyone at BTC had ever instructed Mr. Adams to *not* wear a harness, including on the day of the accident.

{¶33} The evidence in the record supports the trial court's conclusion that BTC provided Mr. Adams with a safety harness while working and that, unfortunately, Mr. Adams made the decision not to wear fall safety protection on the date of the accident.

### Structurally Deficient Tectum

{¶34} The contract between BTC and FirstEnergy recognized that some tectum would need to be replaced and an allowance for a replacement of 10% of the tectum decking was included in the contract. Ms. Adams contends that this contractual allowance establishes that BTC acted with an intent to injure, presumably under R.C. 2745.01(A). She argues that the 10% allowance establishes "[i]n essence, BTC ordered [Mr. Adams] to work in a minefield where it knew at least 10% of the area contained mines[.]"

{¶35} A review of the record shows that Ms. Adams did not argue in the court below that the contractual tectum replacement allowance establishes an intent to injure. Therefore, it is being raised for the first time on appeal.

> When reviewing arguments on appeal, this Court cannot consider issues that are raised for the first time on appeal. The Ohio Supreme Court has stated that other than issues of subject matter jurisdiction, reviewing courts do not consider questions not presented to the court whose judgment is sought to be reversed. It is well established that an appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.

(Internal quotations and citations omitted.) *Harris v. Akron*, 2009-Ohio-3865, ¶ 9 (9th Dist.). Because Ms. Adams did not raise this argument in the trial court, she has forfeited it on appeal.

{¶36} Construing all materials in a light most favorable to Ms. Adams, the nonmoving party, we cannot say the trial court erred when it granted summary judgment in favor of BTC. There is no evidence that BTC intended to harm Mr. Adams or that it removed any equipment

safety guards such that it is liable for an employer intentional tort pursuant to R.C. 2745.01. Ms. Adams' first assignment of error is, accordingly, overruled.

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANTS-APPELLEES FIRSTENERGY CORP., FIRSTENERGY SERVICE COMPANY, AND AMERICAN TRANSMISSIONS SYSTEMS, INC.**

{¶37}  Ms. Adams argues in her second assignment of error that the trial court erred in granting summary judgment in favor of FirstEnergy.  We disagree.

### Standard of Review on Summary Judgment

{¶38}  As previously set forth, summary judgment is appropriate under Civ.R. 56(C) when (1) no genuine issue of material fact remains; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. *Temple*, 50 Ohio St.2d at 327, citing Civ.R. 56(C).  The facts must be viewed in the light most favorable to the nonmoving party and any doubt must be resolved in favor of the nonmoving party. *Murphy*, 65 Ohio St.3d at 358-359. This Court reviews a summary judgment order de novo. *Grafton*, 77 Ohio St.3d at 105.

### Ms. Adams' claims against FirstEnergy

{¶39}  There is no dispute that FirstEnergy owns Building No. 5. The trial court found that, even if "the FirstEnergy Defendants [FirstEnergy Corp., FirstEnergy Services Company, and American Transmissions Services, Inc.] are one in the same or were both involved in this project, the evidence does not support a finding of liability as to either entity." The trial court held that FirstEnergy was not liable as it did not actively participate in the project. It further determined that FirstEnergy did not have actual or constructive notice of a dangerous condition that the

independent contractor did not have and that it was not liable under an ordinary premises liability theory.

**{¶40}** Ms. Adams maintains on appeal that FirstEnergy actively participated in the roof replacement project. She asserts, as she did in the court below, that FirstEnergy knew the tectum was decayed and lacked adequate structural support. FirstEnergy contends the trial court properly found that there is no genuine issue of material fact that it did not actively participate in the project. It further argues that summary judgment was properly granted on ordinary premises liability as ordinary premises liability does not apply to inherently dangerous work.

### Relevant Background

### FirstEnergy and Technical

**{¶41}** FirstEnergy contracted with and hired Technical to "[i]nspect and evaluate existing roof[] systems throughout [its properties] and [to] develop an accurate condition assessment[], solutions for repair, restoration and remediation, and estimates for repairs or replacement." FirstEnergy hired Technical well before the roof replacement project began. There is no dispute that Technical was responsible for OSHA compliance and safety under its contract with FirstEnergy.

**{¶42}** Brian Linc, Technical's project manager for the Building No. 5 project, testified that his role "from the very beginning," was to "do an assessment of the existing roof, do field measurements, deduce what the appropriate roof design for the replacement would be, [and] produce roof replacement documents for the design documents." Technical then "put a group of potential bidders together for the roof replacement" and "distribute[d] the documents to the bidders." Mr. Linc testified:

> My role [was] to convey the design to the bidders during a pre-bid meeting. Make
> sure they understand. I think we did a field walk during the pre-bid phase so that

they could walk the roof and have eyes on the roof to understand what their scope would be.

They submit the bids. **We review the bids. And then we qualify the bids.**

We have another meeting with the bidder and go through their bid document to make sure their bid document includes everything that the design would require. . . .

So we go through the documents one by one, make sure the numbers are accurate. Make sure they have included all the items in the scope they are supposed to include.

(Emphasis added.) Technical provided supervisory services during the roof replacement project. Mr. Linc communicated with Diego Gallardo, FirstEnergy's project manager, while the project was ongoing.

{¶43} The evidence in the record supports the conclusion that FirstEnergy contracted with Technical and relied on Technical to inspect and assess roofs at Building No. 5, to determine and design the roof replacement project, and to review and qualify bids. The record further supports the conclusion that FirstEnergy relied on Technical when it contracted with BTC; it assigned OSHA compliance and safety responsibilities to Technical; and it relied on Technical to monitor the roof replacement project and BTC's work.

### FirstEnergy and BTC

{¶44} FirstEnergy awarded the bid to complete the roof replacement project to BTC and the parties entered into a written contract for the project. The contract incorporated FirstEnergy's contractor safety requirements. BTC was responsible for the training and safety of its employees under its contract with FirstEnergy. It was also responsible for providing its employees with fall protection. Ms. Adams does not dispute the contractual language or BTC's responsibilities under its contract with FirstEnergy.

**Analysis**

{¶45} Ms. Adams argues that Mr. Adams' accident, injuries, death, and resulting damages were a direct and proximate result of the negligence of FirstEnergy. To establish a claim of negligence, a plaintiff must prove: (1) that the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; and (3) injury resulting from the breach. *Mussivand v. David*, 45 Ohio St.3d 314, 318 (1989). "Where there is no duty or obligation of care or caution, there can be no actionable negligence." *Hudson v. DaimlerChrysler Motors*, 2004-Ohio-3416, ¶ 7 (9th Dist.), citing *Mussivand* at 318, citing *United States Fire Ins. Co. v. Paramount Fur Serv., Inc.*, 168 Ohio St. 431, paragraph three of the syllabus (1959). "The existence of a duty in a negligence action is a question of law for the court to determine." *Mussivand* at 318.

{¶46} "[A] 'construction site is inherently a dangerous setting.'" *Nagy v. Fred Albrecht Grocery*, 2023-Ohio-4049, ¶ 9 (9th Dist.), quoting *Bond v. Howard Corp.*, 72 Ohio St.3d 332, 336 (1995). There is no dispute that Mr. Adams was engaged in inherently dangerous work at the time of the accident working on a roof. *Lamb v. Summit Mall*, 2001 WL 39597, *3 (9th Dist. Jan. 17, 2001) ("Falling from a roof that one is working on . . . is one of the inherent hazards of working on a roof."); *Hackney v. Ward*, 2014-Ohio-4413, ¶ 14 (2d Dist.) (working on a roof is an inherently dangerous activity).

{¶47} Under Ohio law, a property owner does not owe a duty to the employees of an independent contractor that engages in an inherently dangerous activity unless the property owner:

> 'actively participated' [i.e.,] directed the activity which resulted in the injury and/or gave or denied permission for the critical acts that led to the employee's injury, rather than merely exercising a general supervisory role over the project.

(Citations and quotations omitted.) *Nagy* at ¶ 10 (9th Dist.). A property owner actively participates when it "either directs or exercises control over the work activities of the independent contractor's

employees, or where the owner 'retains or exercises control over a critical variable in the workplace.'" *Id.*, quoting *Sopkovich v. Ohio Edison Co.*, 81 Ohio St.3d 628, 643 (1998). The Ohio Supreme Court has not defined retaining or exercising "control over a critical variable in the workplace." *Sopkovich* at 643. The Fourth District Court of Appeals has found that the mere ownership of the instrument that caused harm is not sufficient to constitute control over a critical variable. *Frost v. Dayton Power and Light Co.*, 138 Ohio App.3d 182, 202 (4th Dist. 2000) (court found "no merit to appellant's argument that appellee, by virtue of its ownership of the [building and the] pipe [that caused injury], retained exclusive control over a critical variable in the work environment.").

{¶48} Mere supervision over a construction project is not active participation. *Michaels v. Ford Motor Co.*, 72 Ohio St.3d 475, 479-480 (1995); *Cafferkey v. Turner Constr. Co.*, 21 Ohio St.3d 110 (1986), syllabus. The Ohio Supreme Court has established that:

> [s]upervision of a construction job, *i.e.,* coordinating work and directing contractors to perform tasks in accordance with contract specifications, has never constituted 'active participation' in the work of an independent contractor. The very nature of the construction business requires a general contractor or the owner of a construction site to 'supervise' a construction job. An owner of a construction site who merely directs an independent contractor to perform a task required by contract specifications but does not retain control over the means or manner in which that task is performed does not owe a duty of care to an employee of a subcontractor who is subsequently injured as a result of the other contractor's performance of the task in an unsafe manner.

*Michaels* at 479-489.

{¶49} In *Michaels*, Ford Motor Company hired Lathrop Contracting as the general contractor "[t]o construct a paint building at its truck plant[.]" *Id.* at 475. "Doane Electric was an electrical subcontractor on the construction site." Mr. Michaels, a Doane Electric employee, sustained injuries and died after falling through a hole that Lathrop's employees had cut in the second floor. *Id.* The evidence in that case established that a Ford employee had instructed

Lathrop's assistant superintendent to cut holes in the second floor, believing the holes were needed for the job; that Lathrop believed the holes created a safety concern and had objected to cutting the holes at that time; and, that a Ford employee had told Lathrop that "you've got a job to do friend, you've got a contract, you cut the holes and you cover them." *Id.*

{¶50} Lathrop covered the holes with a piece of plywood, without securing the plywood to the floor. *Id.* at 476. "No one from Ford told any Lathrop employee how to cover any of the holes, including the one through which Michaels fell." *Id.* at 476. Lathrop was responsible under its contract with Ford for "providing and maintaining barricades and guard rails around floor openings until the openings were enclosed by permanent construction." *Id.* at 476.

{¶51} Ford argued that it did not owe a duty of care to Michaels. The trial court agreed and granted summary judgment in favor of Ford. This Court affirmed the judgment of the trial court, concluding that summary judgment was properly granted as Ford did not actively participate in the job of the independent contractor. *Michaels v. Ford Motor Co.*, 1994 WL 18639, *3 (9th Dist. Jan. 19, 1994). We stated in *Michaels*:

> A landowner or general contractor actively participates in the subcontractor's work when he is affirmatively involved in the critical acts leading up to the subcontractor's employee's injuries. *Cafferkey*[], 21 Ohio St.3d [], [at] 112. In this case, Ford's only participation was requiring Lathrop to cut the floor openings as the contract provided. From that point, Lathrop decided how this would proceed and the manner of warnings and safety precautions that would protect workers at the construction site from hazard. Ford did not owe a duty of care to Michaels as it was acting in a supervisory capacity only. *Id.* at 113.

*Id.* at *3.

{¶52} The Ohio Supreme Court agreed with this Court's analysis in *Michaels* and affirmed summary judgment in favor of Ford. *Michaels*, 72 Ohio St.3d at 480. It concluded that Ford "exercised its proper supervisory role by monitoring work progress at the construction site, interpreting plans and specifications, and ensuring that construction was completed according to

required specifications." *Id.* at 479. The Court noted that Ford's direction to Lathrop that it "cut floor openings as required by contract specifications" was part of Ford's "supervision" and did not constitute active participation; that Ford did not direct Lathrop as to the manner in which to safeguard the hole, nor did it give or deny "permission with regard to the way in which the hole was covered[;]" that Ford "retained no custody or control over the area where Lathrop cut the hole through which Michaels subsequently fell[;]" and that Ford did not "retain control over the means or manner of Lathrop's or Doane Electric's performance of any of their duties at the construction site." *Id.*

{¶53} The trial court found in this case that "[t]here is no evidence in the record to show active participation" of the FirstEnergy Defendants. It found that the conduct alleged by Ms. Adams, including "controlling access to the jobsite, checking temperatures, requiring that contractors follow their own and the FirstEnergy Defendants' safety plans and communicating through TEAMS" "do not rise to the level of active participation under Ohio law." The evidence in the record supports the conclusion that there is no factual dispute that FirstEnergy did not actively participate or control a critical variable in the roof replacement project.

{¶54} We cannot say that the trial court erred in granting summary judgment regarding FirstEnergy's role, as its role was like Ford's role in *Michaels*, a supervisory role and not "active participation." The evidence in the record supports the conclusion that it is undisputed that FirstEnergy did not control the manner and means by which its contractors performed the work. The record supports the conclusion that FirstEnergy, rather, relied on Technical to monitor BTC's work and that BTC communicated with Technical "to make sure that the roof was being installed per the design documents." Ms. Adams' expert acknowledges that "[BTC] had more daily interaction with [Technical] than with FirstEnergy[.]"

{¶55} The record shows that FirstEnergy contractors had access to the Building No. 5 areas including the roof. While FirstEnergy provided security badges to contractor's employees, the evidence supports the conclusion that employees could come and go as needed. Providing security badges does not constitute active participation or control of a critical variable in the project.

{¶56} There is no evidence in the record establishing that Mr. Gallardo, FirstEnergy's project manager, or anyone else at FirstEnergy instructed Mr. Adams or anyone else at BTC on how to perform their job or that it had constructive notice of any dangerous conditions that the independent contractors did not have. Mr. Gallardo had been off work due to illness and was not even at the jobsite around the time of the accident, including the day of Mr. Adams' fall. There is no evidence that FirstEnergy had knowledge about the RTU5 area that either Technical or BTC did not have. BTC was contractually responsible for the training, supervision, and safety of its employees. It was responsible for monitoring its employees on a continual basis to ensure employee safety. BTC was required to have its own fall protection protocol. We cannot say that the trial court erred when it found no material fact showed that FirstEnergy actively participated or controlled any critical acts that led to Mr. Adams' accident.

{¶57} Further, there is no evidence that FirstEnergy had actual or constructive notice of a dangerous condition that the independent contractors did not have such that, even if FirstEnergy had actively participated or controlled a critical variable, FirstEnergy had a duty to Mr. Adams. FirstEnergy's contract with BTC allowed for the replacement of defective tectum. Mr. Peet testified that he and Mr. Adams conducted a walk-through of the project site where they had determined a safety plan and the structural stability of the tectum. The area where Mr. Adams fell was covered by the RTU5 unit until the unit was removed on December 21, 2020. There is no

genuine issue of material fact in the record to establish that FirstEnergy had actual or constructive notice about any dangers relating to the RTU5 area, or any other areas of the roof that the independent contractors did not have, such that it owed a duty.

{¶58} Based on the evidence in the record, we conclude that the trial court did not err in granting summary judgment in favor of FirstEnergy. Ms. Adams' second assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. 3

**THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANTS-APPELLEES IVY E. WALTERS DBA THE SAFETY PRO GROUP AND RONALD GILBERT, JR. DBA SAFETY PRO.**

{¶59} Ms. Adams argues in her third assignment of error that the trial court erred in granting judgment in favor of Safety Pro. We disagree.

{¶60} We incorporate the summary judgment standard of review set forth in Ms. Adams' first and second assignment of error.

### Ms. Adams' claims against Safety Pro

{¶61} There is no dispute that Safety Pro contracts with various contractors in the construction industry to provide awareness training to employees. Its training is not limited to roofing contractors. Ronald Gilbert testified that Safety Pro's annual training is non-specific and it includes "an hour of drug and alcohol" training and a "refresher or reminder" on "[c]onstruction-type stuff; ladders, HazCom, lockout/tagout, [and] fall protection[.]" Safety Pro also provides site specific safety audits when requested by clients.

{¶62} Safety Pro contracted with BTC for decades to provide safety training and site audits, with its contract renewed 13 days before Mr. Adams' accident on December 10, 2020. Safety Pro was obligated under its contract with BTC to provide one employee training session

and six job site inspections for the contracted year. BTC agreed in the contract to hold Safety Pro "harmless from any and all claims and judgments from injury or death to persons and/or property[.]"

{¶63} There is no dispute that Safety Pro provided annual safety training to BTC employees on January 24, 2020, *i.e.* nine months before BTC was selected for the roof replacement project at Building No. 5 and approximately 11 months before Mr. Adams' accident. There is also no dispute that BTC never asked Safety Pro to perform a safety audit of Building No. 5 and that Safety Pro had not been to this site prior to Mr. Adams' accident.

{¶64} Ms. Adams alleges that Safety Pro "negligently performed safety training" and that it was foreseeable this negligence would "cause injury[.]" The trial court granted summary judgment in favor of Safety Pro and found that it "did not have any duty to [Mr.] Adams in this matter." It held that "worksite safety is a non-delegable duty" and that "BTC, as [Mr.] Adams' employer, could not delegate the Building No. 5 worksite safety to Safety Pro[.]"

{¶65} Ms. Adams maintains on appeal that Safety Pro is liable for its own negligence. She argues that Safety Pro had heightened knowledge about the danger of working around tectum and that it negligently failed to provide adequate safety training on this danger. Safety Pro contends the trial court properly concluded that Ms. Adams' claims against it involve nondelegable duties.

## Negligence and Non-Delegable Duties

{¶66} A plaintiff must establish the existence of a duty, a breach of that duty, and proximate causation to succeed on a negligence claim. *Mussivand*, 45 Ohio St.3d at 318. "[I]n order to defeat a motion for summary judgment brought in a negligence action, a plaintiff must identify a duty owed to him or her by the defendant." *Graham Staley v. Bogner Const. Co.*, 2002 WL 122152, *4 (9th Dist. Jan. 30, 2002). The existence of a duty must be established by sufficient

evidence "to allow reasonable minds to infer that the duty was breached, that the breach of that duty was the proximate cause of the plaintiff's injury, and that the plaintiff was injured." *Id.* There can be no actionable negligence where there is no duty. *Nagy*, 2023-Ohio-4049, at ¶ 8 (9th Dist.); *Hudson*, 2004-Ohio-3416, at ¶ 7 (9th Dist.). Whether a duty exists is a question of law for the court to determine. *Mussivand* at 318; *Nagy* at ¶ 8.

{¶67} The Ohio Supreme Court has explained that "[d]uty . . . refers to the relationship between the plaintiff and the defendant from which arises an obligation on the part of the defendant to exercise due care toward the plaintiff." *Commerce & Industry Ins. Co. v. Toledo*, 45 Ohio St.3d 96, 98 (1989); *Wallace v. Ohio Dept. of Commerce*, 2002-Ohio-4210, ¶ 23. "[T]he existence of a duty depends upon the foreseeability of harm: if a reasonably prudent person would have anticipated that an injury was likely to result from a particular act, the court could find that the duty element of negligence is satisfied." *Wallace* at ¶ 23. The Court recognized in *Wallace* that "the duty element of negligence may be established by common law, by legislative enactment, or by the circumstances of a given case" and that, "[a]dmittedly . . . the concept of duty in negligence law is at times an elusive one." *Id.*

{¶68} As previously set forth, the trial court found that worksite safety is a duty that BTC owes to its employees and that it is a non-delegable duty. Because worksite safety is a non-delegable duty, it held that Safety Pro owed no duty to Mr. Adams.

{¶69} Under the non-delegable duty doctrine, "the employer may delegate *work* to an independent contractor, but he cannot delegate the *duty*." (Emphasis in original.) *Pusey v. Bator*, 94 Ohio St.3d 275, 279 (2002). The Court explained in *Pusey* that non-delegable duties:

> arise in various situations that generally fall into two categories: (1) affirmative duties that are imposed on the employer by statute, contract, franchise, charger, or common law and (2) duties imposed on the employer that arise out of the work

itself because its performance creates dangers to others, *i.e.* inherently dangerous work.

*Id.* at 279. The non-delegable duty doctrine applies if the work that is being performed fits into one of these two categories. *Id.* "In other words, the employer is not insulated from liability if the independent contractor's negligence results in a breach of the duty." *Id.*

{¶70} When construing the evidence in the light most favorable to Ms. Adams, this Court cannot say the trial court erred when it found Safety Pro did not owe a duty to Mr. Adams. Roofing is inherently dangerous work. *Lamb*, 2001 WL 39597, at \*3 (9th Dist. Jan. 17, 2001); *Hackney*, 2014-Ohio-4413, at ¶ 14 (2d Dist.). Thus, the duties imposed on BTC to ensure a safe working environment are non-delegable. *Pusey* at 279; *State ex rel. Cotterman v. St. Marys Foundry*, 46 Ohio St.3d 42, 48 (1989) ("The ultimate responsibility of providing a safe work environment lies with the employer and it cannot be delegated to a subordinate."); *State ex rel. Morrissey v. Indus. Comm.*, 18 Ohio St.3d 285, 288 (1985), quoting *State, ex rel. Blystone, v. Indus. Comm.,* 14 Ohio App.3d 238, 239 (10th Dist. 1984) ("'The duty to comply with a specific safety standard is constitutionally that of the employer to provide for the protection of the lives, health or safety of employees.'").

{¶71} Further, there is no dispute that BTC never asked Safety Pro to perform a safety audit or consulting related to Building No. 5, nor was it contractually obligated to provide advice or consulting on this site-specific project. Safety Pro had no involvement in the pre-construction assessment of the existing roof condition at Building No. 5, and it was not responsible for determining what personal protective equipment ("PPE") or fall protection BTC employees were to use at this job. Mr. Getz testified that it was BTC's responsibility to determine if the walking/working surfaces at the jobsite had strength and structural integrity. BTC employees were

trained to wear fall harness protection when working near holes; their training was not limited to Safety Pro's annual training. BTC roofers received union and on-the-job training.

{¶72}  There is no dispute that Mr. Adams last attended an employee training session with Safety Pro on January 24, 2020. This training session occurred months before BTC was selected for the Building No. 5 project. The January 2020 training included the following topics: drug and alcohol abuse; fall protection procedures; hazard communication/globally harmonized systems; PPE; ladders; and accident reporting. There is no genuine issue of material fact in the record to establish that Safety Pro was contractually obligated or had a duty to provide additional training about the dangers of working around tectum.

{¶73}  Additionally, Ms. Adams points to no genuine issue of material fact that Safety Pro had a heightened knowledge of specific dangers relating to the Building No. 5 location or that it had a foreseeable duty to provide site-specific training in January, 2020. As previously stated, BTC was not selected for the project until months after Safety Pro provided safety training and BTC never asked Safety Pro to conduct a site-specific audit. Even if Safety Pro had consulted BTC on its fall protection policy, the evidence in the record supports the conclusion that BTC developed and implemented its own policies for jobsite safety, including a fall protection program and a formal employee training and information policy. There is no dispute that BTC's fall protection policy at the time of Mr. Adams' accident was consistent with OSHA requirements.

{¶74}  We cannot say the trial court erred when it found no genuine issue of material fact and granted summary judgment in favor of Safety Pro. Ms. Adams' third assignment of error is overruled.

<u>**ASSIGNMENT OF ERROR NO. 4**</u>

**THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANT-APPELLEE TECHNICAL ASSURANCE, INC.**

{¶75}   Ms. Adams argues in her fourth assignment of error that the trial court erred in granting summary judgment to Technical. We disagree.

{¶76}   We incorporate the summary judgment standard of review set forth in Ms. Adams' first, second, and third assignments of error.

### Ms. Adams' claims against Technical

{¶77}   Technical's involvement with the Building No. 5 roof replacement project is set forth in this Court's analysis under the second assignment of error and is incorporated as if fully restated herein. There is no dispute that Technical contracted with FirstEnergy to assess and design the roof replacement project. It conveyed its design to bidders, reviewed bids, and qualified bids. Technical provided continued supervision during the project.

{¶78}   Ms. Adams alleges that, like BTC, FirstEnergy, and Safety Pro, Technical was negligent. A plaintiff must prove duty, breach, and injury resulting from the breach to establish a negligence claim. *Mussivand,* 45 Ohio St.3d at 318. As noted by the trial court, the law relating to the duty for Technical is the same as the law related to the duty for FirstEnergy.

{¶79}   The trial court found that "Technical did not actively participate in the critical acts that led to" Mr. Adams' accident and that, therefore, it did not owe a duty. Ms. Adams argues on appeal that Technical owed a duty to analyze the structural integrity of the tectum and that it breached this duty. She argues that Technical's "failure . . . to identify defective tectum, led to a secondary failure to ensure proper fall protection was in place and required for people on the roof . . . ." Technical maintains that it did not actively participate in the roof replacement project and that it did not actively participate in selecting and replacing tectum panels. The evidence in the record supports the judgment of the trial court that Technical did not actively participate in the project.

{¶80} "[A] 'construction site is inherently a dangerous setting'" and there is no dispute that Mr. Adams was engaged in inherently dangerous work at the time of the accident. *Nagy*, 2023-Ohio-4049, at ¶ 9 (9th Dist.), quoting *Bond,* 72 Ohio St.3d at 336. *See e.g.*, *Lamb*, 2001 WL 39597, at *3 (9th Dist. Jan. 17, 2001); *Hackney*, 2014-Ohio-4413, at ¶ 14 (2d Dist.). Accordingly, Technical did not owe a duty to Mr. Adams unless it actively participated in the project or was involved in a critical act that led to the accident. *Michaels*, 72 Ohio St.3d at 479-480.

{¶81} As set forth under this Court's analysis in the second assignment of error above, the Ohio Supreme Court has held that mere supervision over a construction project does not constitute active participation. *Id.; Cafferkey*, 21 Ohio St.3d 110 at syllabus. "'The very nature of the construction business requires a general contractor . . . to 'supervise' a construction job.'" *Michaels*, 72 Ohio St.3d at 479-480*,* quoting *Bond* at 339. "Supervision of a construction job, *i.e.*, coordinating work and directing contractors to perform tasks in accordance with contract specifications, has never constituted 'active participation' . . . ." *Id.* In affirming summary judgment in favor of Ford, the Court noted in *Michaels* that Ford had "exercised its proper supervisory role by monitoring work progress at the construction site, interpreting plans and specifications, and ensuring that construction was completed according to required specifications" and it concluded that this supervisory role did not constitute active participation. *Id.*

{¶82} Ms. Adams does not show that there is a genuine issue of material fact that Technical actively participated in the critical acts that led to Mr. Adams' accident. Technical contracted with FirstEnergy and, pursuant to that contract, it monitored the roof replacement project to ensure the project was being completed in accordance with design specifications. Like Ford in *Michaels*, Technical "exercised its proper supervisory role by monitoring work progress at the construction site, interpreting plans and specifications, and ensuring that construction was

completed according to required specifications." *Id.* at 479. Ms. Adams points to no evidence that Technical directed Mr. Adams or any other BTC workers on how to work around tectum or holes, or that it retained custody or control over the area where Mr. Adams' fell. Further, she points to no evidence that Technical "retain[ed] control over the means or manner of [BTC's or Mr. Adams'] performance of any of their duties at the construction site." *Id.*

{¶83} The record supports the finding of the trial court that there is no evidence establishing a question of fact that it was BTC's responsibility to identify and replace structurally unsound tectum. The contract between BTC and FirstEnergy included a 10% tectum allowance and replacement tectum was available at the job site on the day of Mr. Adams' accident. Ms. Adams points to no evidence that Technical was required to identify structurally unsound tectum; that it actively participated in identifying structurally unsound tectum; that it directed BTC on which specific tectum panels needed to be replaced; or that it instructed Mr. Adams on how to proceed in the RTU5 area. Further, there is no evidence that Technical ever prohibited or prevented BTC from replacing tectum panels. The evidence supports the conclusion that Mr. Peet as project manager and Mr. Adams as project foreman made the decision on behalf of BTC on which tectum panels to replace, and that Mr. Adams decided how to proceed around the RTU5 area on the day of the accident. The evidence supports the finding of the trial court that the policy of BTC assessing and determining which tectum panels needed to be replaced is in accordance with OSHA standards and the BTC fall protection policy stating that the superintendent is responsible for determining the structural integrity of working surfaces.

{¶84} Based on the record in this case, we cannot say that the trial court erred in concluding that Technical did not actively participate in the critical acts that led to Mr. Adams'

accident and that it did not owe a duty in this case. Summary judgment was properly granted in favor of Technical. Ms. Adams' fourth assignment of error is overruled.

## II.

{¶85} The judgment of the Summit County Court of Common Pleas granting the motions for summary judgment of BTC, Safety Pro, Technical, and FirstEnergy is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
SCOT STEVENSON
FOR THE COURT

HENSAL, J.
<u>CONCURS IN JUDGMENT ONLY.</u>

SUTTON, J.
<u>CONCURS IN JUDGMENT ONLY.</u>

<u>APPEARANCES:</u>

CHRISTIAN R. PATNO and COLIN R. RAY, Attorneys at Law, for Appellant.

GREGORY D. BRUNTON, ROBERT P. LYNCH, JR., and BRUCE A. MOORE, Attorneys at Law, for Appellee.

SAMUEL A. MEADOWS, Attorney at Law, for Appellees.

KAITLIN L. MADIGAN and STEVEN G. CARLINO, Attorneys at Law, for Appellees.

DAVID J. FAGNILLI, Attorney at Law, for Appellee.